UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:21-CV-00151-GNS-HBB

JASON JONES                                                                                        PLAINTIFF

v.

FLUOR FACILITY & PLANT SERVICES, INC.                                     DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment (DN 38). The motion is ripe for adjudication. For the reasons that follow, the motion is **GRANTED**.

**I.     BACKGROUND**

Plaintiff Jason Jones ("Jones") was hired by Defendant Fluor Facility and Plant Services, Inc. ("Fluor") in May 2020 to work on the maintenance team. (Jones Dep. 21:23-25, Nov. 21, 2022, DN 38-2). Jones was moved to night shift in September or October of that year and was the only black employee in his crew. (*See* Thornberry Dep. 54:4-16, 57:7-15, Feb. 15, 2023, DN 40-1).

One individual on the same crew as Jones, Tim Bowersox ("Bowersox"), allegedly told racist jokes and at one point asked Jones to tell a racist joke about white people. (Jones Dep. 62:10-63:6). The N-word was used three times in Jones' presence after he was moved to the night shift. (*See* Jones Dep. 59:6-9, 103:6-104:10). The first instance was when a co-worker used the N-word to Jones as a "term of endearment." (Jones Dep. 59:6-12 (quoting Jones Dep. Ex. 1, at 1, DN 38-2)). The co-worker who used the term in that instance was moved to another location two-weeks later. (Jones Dep. Ex. 1, at 1). On November 9, 2020, the crew's supervisor, Mark Thornberry ("Thornberry"), held a meeting to address racist jokes and language in the workplace.

(Thornberry Dep. 79:18-81:5). Jones alleges that the N-word was used two times by a co-worker, Joe Fleming ("Fleming"), at the meeting. (*See* Jones Dep. 103:6-104:10; Thornberry Dep. 80:5-23). Usage of the N-word in this meeting was not directed at Jones, but instead in the context of whether use of the N-word was appropriate in the workplace. (*See* Thornberry Dep. 79:18-80:23; Jones Dep. 103:15-104:10). After this meeting, there were no further uses of direct racial epithets. (*See Jones. Dep.*; Pl.'s Resp. Mot. Summ. J. 10, DN 40 [hereinafter Pl.'s Resp]).

Jones also testified: "Boy was used a lot. I was told I was a rapper because I was black. I was told I made a lady uncomfortable because I was black. I was told I played basketball because I was black." (Jones Dep. 266:18-21). Jones states that he was not called "boy" directly but only heard about the use of that term through Thornberry. (*See* Jones Dep. 266:23-267:7). Jones testified that comments about basketball or him being a rapper usually occurred when he met someone new, and that these sorts of comments occurred at least thirty times, although he could not recall who said them, except one instance where a coworker, Matt Moore, told him he was a rapper. (Jones Dep. 267:14-24, 269:16-270:16). Jones does not state whether these comments were made before or after the November meeting. (*See* Jones Dep.).

Two incidents occurred involving Bowersox following the November 9 meeting. First, Bowersox saw another employee get oil on his arm and then ask Jones if that employee was "[his] boy" which Jones understood to be a racially motivated question. (Jones Dep. Ex. 1, at 2). Second, Bowersox threw some substance, allegedly grease, on Jones' windshield while Jones was in his car. (Jones Dep. 68:18-69:11; Jones Dep. Ex. 1, at 3).

Jones also testified that after the November 9 meeting, he was ostracized by his coworkers through various means. First, he reported that he was excluded from buggy rides to work sites, forcing him to walk. (Jones Dep. Ex. 1, at 4). Jones explained that his coworkers never directly

refused to give him a ride on the buggies, but would simply leave him behind, despite the buggy not being full. (Jones Dep. 71:11-73:3). Jones admitted that he could not recall how far he was required to walk and that his report did not say specifically who did this. (Jones Dep. 72:15-73:5). Jones did not state how often he was excluded from the buggies. (*See* Jones Dep.). Jones also testified that his coworkers seemed to not want to be around him and would leave or turn their back to him in the break room. (Jones Dep. 73:15-23). Jones testified that while he was never told directly not to come into the break room, his coworkers' behavior implied that they did not want to sit with him. (Jones Dep. 73:15-23).

In March 2021, Jones filed a written statement with Fluor describing his coworkers' conduct. (*See* Jones Dep. Ex. 1). Fluor began an investigation and concluded that while there was evidence of joking and horseplay amongst all the night shift crew, including Jones, there was no evidence of any jokes of a racial nature after the November meeting. (Jones Dep. Ex. 11, at 1, DN 38-2). Jones filed an EEOC charge and spoke with an EEOC investigator. The EEOC investigator told Jones that "the information provided did not support a potential violation of the law . . . ." (Def.'s Mot. Summ. J. Ex. 1 (PageID# 628)). Jones filed this action asserting claims that Fluor created a hostile work environment and for retaliation. (Compl. ¶¶ 24-29, DN 1).

## II. JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction. *See* 28 U.S.C. § 1331. In addition, the Court has supplemental jurisdiction over Jones' state law claims. *See* 28 U.S.C. § 1367(a).

## III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as

a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### IV.     DISCUSSION[1]

Fluor asserts that Jones has failed to prove his claims of hostile work environment based on race and retaliation. (Def.'s Mem. Supp. Mot. Summ. J. 10-16, DN 38-1 [hereinafter Def.'s Mem.]).

---

[1] Because courts interpret Title VII and the Kentucky Civil Rights Act ("KCRA") using the same standards, these claims will be analyzed together. *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 n.5 (6th Cir. 1997) (citing *Palmer v. Int'l Ass'n of Machinists*, 882 S.W.2d 117, 119 (Ky. 1994)).

4

A.     **Hostile Work Environment**

Jones claims that he was victim to a racially hostile work environment created by his coworkers' use of racial epithets, racial stereotyping, and shunning him. (Pl.'s Resp. 8-12).

The Sixth Circuit has explained that:

The elements of a racially hostile work environment are as follows: (1) the plaintiff "belonged to a protected group," (2) the plaintiff "was subject to unwelcome harassment," (3) "the harassment was based on race," (4) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) "the defendant knew or should have known about the harassment and failed to act."

*Johnson*, 13 F.4th at 503 (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)). Here, Fluor asserts that Jones lacks evidence to support the fourth and fifth elements. (Def.'s Mem. 11-15).

1.     *Existence of a Hostile Work Environment*

To prove the fourth prong of his *prima facie* case, Jones must establish both the subjective and objective components. *See Bradley v. Arwood*, 705 F. App'x 411, 417 (6th Cir. 2017) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)). For the subjective component, Jones must present evidence "that under the 'totality of the circumstances' the harassment was '"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560, 562 (6th Cir. 1999)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). For the objective component, Jones must show that a reasonable person would find such conduct hostile or abusive. *See Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively

hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.").

This inquiry is not "'a mathematically precise test' but [the Supreme Court] has provided some guidance on relevant considerations, 'includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.'" *Johnson*, 13 F.4th at 505 (second alteration in original) (quoting *Harris*, 510 U.S. at 22-23). When considering the "totality of circumstances," the relevant inquiry does not focus on individual incidents of harassment, standing alone, but instead considers whether all the incidents of alleged harassment, taken together, are sufficient to sustain the cause of action. *Id.* (quoting *Williams*, 187 F.3d at 562). Importantly, "Title VII does not create a workplace 'civility code.'" *Brown v. Potter*, 516 F. App'x 563, 566 (6th Cir. 2013) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Generally, 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Johnson*, 13 F.4th at 505 (quoting *Faragher*, 524 U.S. at 788).

Here, Jones points to his coworkers' use of the N-word, race related comments by his coworkers, an incident where a coworker put something on his car, and his coworkers' behavior of ignoring him as evidence of severe and pervasive harassment.[2] (Pl.'s Resp. 9-12). Applying

---

[2] Jones also alleges that he was the victim of physical attacks at the hands of a co-worker, Brandon Arnold ("Arnold"). (Jones Dep. 28:24-29:11). Jones testified that Arnold hit him in the face with his shoulder twice and attempted to headbutt him once. (Jones Dep. 29:2-31:20). Jones does not, however, offer any evidence indicating that this incident was related to his race, nor does Jones allege any further conduct on the part of Arnold. (*See* Jones Dep.). Therefore, this does not support Jones' hostile work environment claim. *See Armstrong v. City of W. Buechel*, No. 3:17-cv-260-DJH-CHL, 2019 WL 5558576, at *5 (W.D. Ky. Oct. 28, 2019) ("Because Armstrong produces no evidence suggesting that the latter two incidents were related to his race, the Court may not consider them." (internal citation omitted) (citation omitted)); *see also Jordan v. City of*

6

the Supreme Court's suggested considerations makes it clear that here, Jones has failed to prove a *prima facie* case that his coworker's conduct rose to the level of severe or pervasive harassment. *See Johnson*, 13 F.4th at 505 ("[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." (quoting *Harris*, 510 U.S. at 22-23)).

Prior to the November 9 meeting, there were clearly a few incidents of racist language and joking. Jones points to three uses of the N-word, only one of which was actually directed towards him as a "term of endearment." (Jones Dep. 59:6-12 (quoting Jones Dep. Ex. 1, at 1)). The other two uses were made in the context of a meeting about the impropriety of using the N-word or making racist jokes at work and not directly towards Jones. (Thornberry Dep. 79:18-81:5; Pl.'s Resp. 10 (citing Jones Dep. 103:6-104:10)). The fact that these uses were not directed towards Jones diminishes their severity. *Strickland v. City of Detroit*, 995 F.3d 495, 506 (6th Cir. 2021) ("We have also held . . . that if the conduct that forms the basis of a plaintiff's hostile work environment claim is not directed at that plaintiff, that fact 'diminishes [its] severity.'" (second alteration in original) (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009))). Bowersox also asked Jones to tell a racist joke about white people. (Jones Dep. 62:10-63:6). While Jones asserted that Bowersox had made racist jokes, Jones provided no information as to the content or frequency of these jokes. (*See* Jones Dep. 63:3-6). All these events happened within the first month or two after Jones joined the nightshift and all were "mere offensive utterances." (*See* Thornberry Dep. 54:4-16; Pl.'s Resp. 10); *Johnson*, 13 F.4th at 505 (quoting *Harris*, 510 U.S. at 22-23)).

---

*Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) ("[I]t is axiomatic that on this claim Jordan must provide a causal nexus between his race and the complained-of conduct.").

7

Following the November 9 meeting, Jones only points to a single specific instance of an arguably racial comment being made where Bowersox asked Jones if another coworker, who had grease smeared on his arm, was "his boy." (Jones Dep. Ex. 1, at 2). Even inferring that there was racial animus behind this comment, it was likewise only a "mere offensive utterance." *Johnson*, 13 F.4th at 505 (quoting *Harris*, 510 U.S. at 22-23)).

The remaining conduct, an isolated incident where Bowersox poured grease on Jones' windshield and the vague assertions that his coworkers ignored or isolated him are not explicitly racial in nature. (Jones Dep. 68:18-69:11, 71:11-73:23). Jones' other allegations related to Bowersox support the reasonable inference that the incident where Bowersox threw grease onto Jones' windshield was race based. *Jordan*, 464 F.3d at 596 ("[F]acially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct" (second and third alterations in original) (citations omitted)). With respect to the remaining conduct, there is simply insufficient information to support a "reasonable inference" that it was based on Jones' race. *Cf. Evans v. Pro. Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015) ("Circumstantial evidence can support a reasonable inference of the decisionmaker's knowledge if the evidence is comprised of 'specific facts' and not merely 'conspiratorial theories,' 'flights of fancy, speculations, hunches, intuitions, or rumors.'" (citation omitted)). Even allowing the inference that all of this conduct was race-based, however, Jones has failed to supply sufficient evidence from which a jury could conclude that the conduct rose to the "relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017).

*Reed v. Procter & Gamble Manufacturing Co.*, 556 F. App'x 421 (6th Cir. 2014), is particularly instructive here. In *Reed*, the Sixth Circuit affirmed summary judgment on a claim for hostile work environment where the plaintiff relied on evidence that he was "excluded from lunches with colleagues and treated in a cold manner by his managers," of the use of racial slurs by his colleagues, of threatening communications from one particular coworker, and of an incident where that same coworker created a noose from a telephone cord while the plaintiff was nearby. *Reed*, 556 F. App'x at 432. The court found that there was only evidence that the racial remarks and noose incident were race-related and that these failed to amount to evidence of a hostile work environment because the racial remarks "were offensive but not particularly serious or threatening." *Id.* at 433. The Sixth Circuit noted that the noose incident was "more troubling" but that it was only an isolated incident and concluded that the plaintiff had failed to establish the existence of a hostile work environment. *Id.* The facts in *Reed* parallel the facts of the instant case. Jones has complained of racial remarks, exclusion, and one isolated incident by a coworker. As in *Reed*, this conduct is not sufficiently severe or pervasive to establish a hostile work environment.

Further, the majority of Jones' claims are simply too vague to support the notion that his coworkers' conduct was sufficiently severe or pervasive. *See Fuelling v. New Vision Med. Lab'y LLC*, 284 F. App'x 247, 259 (6th Cir. 2008) ("Most problematic for Fuelling, however, is the fact that she failed to present any evidence to substantiate her conclusory assertions that the remarks occurred 'numerous' times, 'often,' or 'regularly' during her two-year tenure with New Vision. Such allegations are unaccompanied by specific instances of racial comments to support her claim that they occurred so frequently as to be severe or pervasive, and give no indication of the time, place, or context of the remarks."); *Ladd*, 552 F.3d at 501 ("Indeed, in drawing inferences in her

9

favor for the purposes of summary judgment, we are limited by her total lack of specificity as to verbal abuse she received apart from the aforementioned remarks."); *Rushton v. Experi-Metal, Inc.*, No. 19-cv-11318, 2020 WL 7480548, at *9 (E.D. Mich. Dec. 18, 2020) ("The Court agrees that Plaintiff's vague allegations that Ullmann made 'black jokes' and that he overheard people saying 'silverback' behind his back, without specific dates, times, or descriptions, offer little support for the frequency or pervasiveness for his claim of a hostile work environment." (citations omitted)).

Jones fails to point to evidence of these incidents containing information such as specific dates, descriptions, or the identities of the individuals involved with respect to his allegations of being skipped over for rides in buggies, being ignored in the breakroom, stereotyping about rapping or basketball, or being called "boy." Without such information, the Court can (and a jury could) only speculate as to the frequency and severity of the behavior. Further, the behavior described amounts only to offensive utterances and social avoidance, neither of which, alone, can support a claim of a hostile work environment. *Harris*, 510 U.S. at 21 (explaining that "'mere utterance of an . . . epithet which engenders offensive feelings in a [sic] employee,' does not sufficiently affect the conditions of employment to implicate Title VII." (internal citation omitted)); *Russell v. Ohio, Dep't of Admin. Servs.*, 302 F. App'x 386, 394 (6th Cir. 2008) ("[M]ere social avoidance without more is not the kind [of] harm that gives rise to a claim.").

Jones has failed to prove a *prima facie* case of a hostile work environment because he has not supplied evidence showing that his coworkers' conduct, other than the use of racial epithets and the incident where Bowersox poured grease on his windshield, was related to his race. With respect to the use of racial epithets and the grease being poured in his windshield, these events were not "sufficiently severe or pervasive to alter the conditions of employment and create an

10

abusive working environment." *Johnson*, 13 F.4th at 503 (quoting *Williams*, 643 F.3d at 511). The Court need not reach whether Fluor knew or should have known about the harassment and failed to act. Accordingly, Fluor's motion for summary judgment is granted as to Jones' hostile work environment claims.

      B.     **<u>Retaliation</u>**

Fluor also seeks summary judgment on Jones' retaliation claim. (Def.'s Mem. 16-18). In the Complaint, Jones alleges that "once [he] complained of the illegal hostile work environment, [Fluor] took numerous retaliatory acts against [him]." (Compl. ¶ 28). Like Jones' other claim, he has not provided any direct evidence of retaliation. Accordingly, the Court will apply the *McDonnell Douglas* burden shifting framework. *See Scott v. Donahoe*, 913 F. Supp. 2d 355, 364 (W.D. Ky. 2012) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009)).

To prove a *prima facie* claim of retaliation, Jones must prove that: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted). "The burden of establishing a prima facie case is not an onerous one." *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885, 906 (W.D. Ky. 2015) (citing *Nguyen*, 229 F.3d at 563). In Fluor's motion, it asserts that Jones cannot prove the third or fourth elements of his *prima facie* case. (Def.'s Mem. 16-18).

Here, the parties sole dispute is whether Jones suffered an "adverse employment action." (*See* Pl.'s Resp. 17-19; Def.'s Reply Mot. Summ. J. 11-12, DN 41). "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities,

11

or a decision causing a significant change in benefits.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (citation omitted). Jones does not identify any action taken by Fluor that falls within the above definition. (*See* Pl.'s Resp. 17-19). Instead, Jones points to the conduct of his coworkers, discussed in the preceding section, as evidence of retaliation. (Pl.'s Resp. 17-19). Jones also asserts that Fluor failed to properly respond to Jones' complaints. (Pl.'s Resp. 19).

The Sixth Circuit has recognized that an employer can be liable for coworker retaliation where:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008) (citations omitted).

A claim for coworker retaliation "is not easily established." *Garcia v. Beaumont Health Royal Oak Hosp.*, No. 22-1186, 2022 WL 5434558, at *8 (6th Cir. Oct. 7, 2022) (noting that the court could only identify two cases where it reversed summary judgment on claims of coworker retaliation). Conduct found sufficient to create a triable issue for coworker retaliation includes "set[ting] fire to one woman's car and another's house after they had lodged complaints with management." *Id.* (citing *Hawkins*, 517 F.3d at 347-49). In *Garcia*, the Sixth Circuit affirmed summary judgment for a claim of coworker retaliation where the plaintiff alleged that her coworker had gossiped about her and told others that she was a liar, creating a situation where "coworkers did not want to be in a room alone with her anymore . . . ." *Id.* at *2. Sister courts have required this same high standard for coworker retaliation claims. *See, e.g.*, *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 823 (M.D. Tenn. 2011) ("Nor does the teasing and rudeness by the

12

plaintiff's co-workers, which was not severe enough to create a hostile work environment, constitute an adverse action."); *Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 925 (W.D. Tenn. 2011) ("Plaintiff's allegations that she was shunned by co-workers after her reassignment to the Detectives Division, even if true, is not sufficient to show a retaliatory adverse employment action." (citation omitted)); *Mendoza v. AutoZone, Inc.*, No. 3:08CV2321, 2010 WL 1956549, at *6 (N.D. Ohio May 14, 2010) ("Being shunned or ostracized by coworkers does not constitute adverse employment action." (citations omitted)).

Like with his hostile work environment claim, Jones' claim of coworker retaliation is premised on rudeness, being shunned, or ostracized. (Pl.'s Resp. 17-20). As in *Garcia*, this conduct simply is not severe enough to meet the high standard required for a claim of coworker retaliation. *Garcia*, 2022 WL 5434558, at *2.

Jones has failed to supply evidence that Fluor took an adverse employment action against him, and therefore has failed to prove a *prima facie* claim of retaliation. Accordingly, the summary judgment is granted as to Jones' retaliation claims.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (DN 38) is **GRANTED**, and the Complaint is **DISMISSED WITH PREJUDICE**. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

February 21, 2024

cc: counsel of record